IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**LAURA L. BROWN**,

     Plaintiff,

     v.

**MICHAEL J. ASTRUE**, **Commissioner
of Social Security,**

     Defendant.

Case No. CV 10-1088-SI

**OPINION AND ORDER**

David Lowry
9900 S.W. Greenburg Road, Suite 130
Portland, Oregon 07223
     Attorney for Plaintiff

Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
U.S. Attorney's Office, District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Jamala Edwards
Special Assistant United States Attorney
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
     Attorneys for Defendant

Opinion and Order, Page 1

SIMON, District Judge.

## I.  INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Laura L. Brown for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Plaintiff's date last insured for DIB is December 31, 2006.[1] Plaintiff alleges disability on the basis of anxiety disorder, post-traumatic stress disorder ("PTSD"), depression, and agoraphobia. The court concludes that the Commissioner's finding of non-disability is supported by substantial evidence in the record for the period between the alleged onset date, June 1, 2001, and December 2004, but is not supported by substantial evidence with respect to the period after December 2004.[2] The court therefore affirms the Commissioner's conclusion that Plaintiff was not disabled between June 2001 and December 2004, but reverses and remands for administrative determination of Plaintiff's disability onset date.

## II.  BACKGROUND

Plaintiff filed an application for benefits on October 20, 2004, alleging disability since June 1, 2001. Her claims were denied initially and upon reconsideration. A hearing was held

---

[1] DIB benefits require at least 20 quarters of coverage within the 40-quarter period that ends with the quarter in which the disability occurred.  The end of a claimant's insured status is frequently referred to as the "date last insured."  In a DIB case, the claimant must prove that the current disability began on or before the date last insured.  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  Proving disability before the date last insured is not necessary for receipt of SSI benefits.

[2] The record of proceedings filed conventionally with the court is missing pages 147-150. These pages apparently contain the records of Holly Hoch, M.D. Dr. Hoch's opinions are not at issue in this case.

before Administrative Law Judge ("ALJ") Catherine Lazuran on May 1, 2007. On June 20, 2007, the ALJ issued a decision finding Plaintiff not disabled. After the Appeals Council denied review on November 24, 2008, the ALJ's decision became the final decision of the Commissioner.

Plaintiff was born in 1965 and was 36 years old at the time of her alleged disability onset date, June 2001. She received an associate degree from community college in June 2004. Her past relevant work is as a data entry and shipping clerk, receptionist, and cashier.

## A.    Medical Evidence

Plaintiff was treated at Physicians' Medical Center between June 1998 and December 2006 by several physicians and by nurse practitioner Anna Rufo. Beginning in February 2002, Plaintiff's primary care physician was Jacqueline Eriksen, M.D. Tr. 262. Chart notes from Physicians' Medical Center indicate that Plaintiff had a "past history of anxiety attacks and also panic attacks," but that she "chooses not to use medication because she feels that she can control them herself." *See, e.g.,* tr. 193 (chart note from Ms. Rufo dated October 5, 1999 noting "history of anxiety and panic attack" and "very sparing" use of Xanax for panic attacks); tr. 195 (chart note dated January 5, 1999: "She chooses not to use medication because she feels she can control them herself. . . . She is aware that the anxiety attacks are affecting her life and that panic attacks have pretty much discontinued. She has those under control.")[3] Ms. Rufo's chart note of January 5, 1999 records that Plaintiff was seeing Michael Miller, M.D. for anxiety attacks, and he had recommended cognitive counseling, but Plaintiff felt she did not need it. Tr. 195.

---

[3] Xanax (alprazolam) is a benzodiazepine used to treat anxiety disorders and panic disorders. U.S. National Library of Medicine, PubMed Health ("PubMed"), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth.

On May 2, 2000, Ms. Rufo wrote that Plaintiff was in the office, "very upset, pacing the floor." Tr. 190. Plaintiff reported that she was being evaluated for her job and was having financial difficulties. *Id.* She was still opposed to any type of medication to prevent the anxiety and panic attacks, but agreed to take Paxil (paroxetine)[4]. *Id.* On May 11, 2000, Plaintiff saw Dr. Eriksen, who gave her a three-month supply of Paxil and Xanax. *Id.*

On February 15, 2002, Dr. Eriksen noted that Plaintiff was requesting Xanax "just to have in her purse as it makes her feel better. Uses it maybe once a month." Tr. 189. Between February 2002 and April 2003, Plaintiff saw Dr. Eriksen approximately six times for routine medical care. On January 22, 2004, Plaintiff reported significant family stressors, primarily estrangement from her daughter, and financial difficulties related to attending community college. Tr. 185. Plaintiff remained "adamant" that she did not want antidepressant medications because they would "sugar coat the problem." *Id.*

On February 10, 2004, Plaintiff asked Dr. Eriksen to write a note to her school explaining that she had a general anxiety disorder with agoraphobia "so that she is able to get some special consideration for testing and classes." Tr. 184. Plaintiff reported suicidal ideation and refused to answer questions about whether she had a plan for suicide. *Id.* Dr. Eriksen encouraged Plaintiff to take an antidepressant and agree to a suicide contract, but Plaintiff refused. *Id.* Dr. Eriksen wrote that she used Plaintiff's desire for the note as the "impetus" for getting Plaintiff to agree to seeing a counselor at Yamhill County Mental Health. *Id.*

On March 31, 2004, Dr. Eriksen wrote that Plaintiff had come in "mainly because she

---

[4] Paroxetine, a selective serotonin reuptake inhibitor ("SSRI") is used to treat depression, panic disorder and anxiety disorder. *Id.*

needs a note for school." Tr. 183. Dr. Eriksen wrote that Plaintiff had "never been interested in taking something regularly to prevent" her anxiety and panic attacks. *Id.* On May 3, 2004, Plaintiff saw Dr. Eriksen for a regular physical examination. *Id.* Plaintiff reported problems with forgetting simple things and being under a great deal more stress as her son was currently in a juvenile detention facility. *Id.* Dr. Eriksen wrote that Plaintiff was taking no medication except "Xanax on a very sparing basis." *Id.* On May 26, 2004, Dr. Eriksen wrote that Plaintiff had started Lexapro (escitalopram)[5], but was still under a significant amount of stress at school. *Id.* Plaintiff reported that Xanax was not helping as much as in the past. Tr. 182. Plaintiff felt that she was hardly able to go to school and did not "even want to leave her house." *Id.* Dr. Eriksen continued Plaintiff on Lexapro and urged her to try Klonopin (clonazepam)[6] for a few days along with the Xanax. *Id.*

On June 21, 2004, Plaintiff saw Dr. Eriksen and expressed concern about toxic exposure to barium carbonate. *Id.* Dr. Eriksen was dubious because Plaintiff had not ingested it. Tr. 181. Dr. Eriksen thought Plaintiff's symptoms could be related to stress and anxiety. *Id.* On August 23, 2004, Dr. Eriksen wrote that Plaintiff's anxiety had worsened since watching a television show with a rape that "brought back a lot of feelings from her previous history of rape." *Id.* Plaintiff was having difficulty sleeping and did not want to leave her house. *Id.* Plaintiff said that she had "not felt like she is able to go out and find work and has not gone back to school over the summer quarter. Just not wanting to leave her home." Tr. 180.

---

[5] Escitalopram, an SSRI,  is used to treat depression and generalized anxiety disorder. PubMed, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth.

[6] Clonazepam is a benzodiazepine used to relieve panic attacks. *Id.*

On September 14, 2004, Dr. Eriksen wrote that a consulting neurologist had concluded that Plaintiff's neurologic symptoms were related to anxiety, not toxic exposure. Tr. 180. Plaintiff said she was taking Klonopin before leaving her house for appointments. *Id.* Plaintiff also reported auditory hallucinations and constant paranoia about someone breaking in to her house. *Id.* Dr. Eriksen started her on Seroquel (quetiapine)[7], and encouraged her to see a psychiatrist at Yamhill County Mental Health. *Id.* On September 28, 2004, Plaintiff said that the Seroquel was not helping. Tr. 179. Plaintiff saw a counselor at Yamhill County Mental Health, Patricia Brown, MSW, between September 15, 2004 and November 30, 2006 . Tr. 127, 254.

On October 11, 2004, Plaintiff was given a comprehensive psychological evaluation by Dale J. Veith, Psy.D. Plaintiff complained of intense anxiety, including panic attacks, agoraphobia, and PTSD. Plaintiff told Dr. Veith she had been sexually molested by her father and that her PTSD was the result of having been raped seven times, including by three uncles. Tr. 136, 137, 139. She said the most recent rape had occurred when she was 17 years old, when she was pistol-whipped and handcuffed. Tr. 138.

Dr. Veith wrote that Plaintiff's performance on measures of cognitive functioning raised "concerns about the adequacy and consistency of her effort on testing." Tr. 137. Similarly, her scores on measures of malingering and psychological symptoms on the Minnesota Multiphasic Personality Inventory 2 ("MMPI 2") were positive. *Id.* Dr. Veith opined that the inconsistency of effort and the indications of symptom magnification in her MMPI 2 profile rendered her test results invalid. *Id.* He diagnosed Plaintiff as a probable malingerer. Tr. 145.

---

[7] Quetiapine, an atypical antipsychotic, is used to treat the symptoms of schizophrenia, bipolar disorder, and depression. *Id.*

On October 20, 2004, Dr. Eriksen noted that Plaintiff that reported she left her house "maybe once a week only to come to physicians' appointments."  Tr. 179. Dr.  Eriksen wrote that Plaintiff was "pacing back and forth, never sat," but did not have pressured speech. *Id.* Dr. Eriksen was concerned about "some psychosis with this depression or maybe some paranoid schizophrenia appearing fairly late." *Id.* She increased the Lexapro dosage and told Plaintiff she needed to see a psychiatrist because "I am not able to completely manage her symptoms, so that we can get her back to her functional life." *Id.*

On December 13, 2004, Plaintiff reported "fairly severe anxiety" and having difficulty leaving her house. Tr. 178. She continued to see Patricia Brown, but had been "a little reticent to go back" to psychiatrist Holly Hoch, M.D., after seeing Dr. Hoch once. *Id.* She was able to sit through the visit and express herself in a normal speech pattern. *Id.* Dr. Eriksen increased the Lexapro dosage and suggested that she take it with Klonopin. Dr. Eriksen urged Plaintiff to follow up with Dr. Hoch for medications. Tr. 177.

On December 15, 2004, Paul Rethinger, Ph.D. reviewed Plaintiff's medical records on behalf of the Commissioner and completed a rating of Plaintiff's functional limitations. He found her moderately impaired in maintaining social functioning, concentration, persistence, or pace. He opined that Plaintiff was unable to understand, remember, and carry out detailed instructions, but could understand, remember, and carry out simple instructions. He thought she was unable to work with the public, but that she could get along with coworkers and supervisors. Tr. 176. Bill Hennings, Ph.D., also reviewing records on behalf of the Commissioner, affirmed Dr. Rethinger's findings on March 25, 2005. Tr. 218.

On May 6, 2005, Plaintiff met with Sally Godard, M.D., a psychiatrist. Tr. 252. Plaintiff

told Dr. Godard that she had increasing problems with panic attacks and agoraphobia, as well as

Obsessive Compulsive Disorder symptoms such as locking doors, checking on things, and not

liking to touch certain objects. *Id.* Plaintiff said she had difficulty with crowds and avoided going

to restaurants. Plaintiff said she "really ha[d] been dysfunctional" since the previous year.

Plaintiff was no longer taking Lexapro and did not use the Klonopin. *Id.* Dr. Godard observed

that Plaintiff was "generally cooperative, but she is very, very anxious. Her palms are cold and

sweaty when I shake hands with her. She is not able to sit down. She walks around the room. . . .

She answers questions appropriately, but only in short words." *Id.* Dr. Godard observed that

Plaintiff's mood and affect were "extremely anxious and upset." *Id.* On May 23, 2005, Plaintiff

described "fits of hysteria," over the past weekend. Tr. 250. She was taking Xanax, but

Dr. Godard started her on Zoloft (sertraline)[8]. *Id.*

     Dr. Godard saw Plaintiff at home[9] on July 2, 2005. Tr. 248. Plaintiff had continued with

the Zoloft and the Xanax, despite "strong feelings against taking medications." *Id.* Plaintiff

reported going to the grocery store with her mother and being able to stay in the store, but unable

to stand in line. *Id.* Dr. Godard wrote that Plaintiff had "made some progress in going outside

with her niece," and that she was "leaving the curtains open in one of her windows." *Id.* Dr.

Godard observed that Plaintiff appeared a "little bit more relaxed," and asked Plaintiff to do

something outside the house once a week and report back to Dr. Godard. *Id.*

_____

    [8] Sertraline is an SSRI used to treat depression, obsessive-compulsive disorder, panic attacks, and PTSD. *Id.*

    [9] Although Dr. Godard and Ms. Brown came to Plaintiff's home, the record indicates that Plaintiff continued to see Dr. Eriksen in her office at regular intervals between May 2005 and December 2006. Tr. 263-67.

Opinion and Order, Page 8

When Dr. Godard saw Plaintiff the following week, Plaintiff was irritable, anxious, and angry. Tr. 246. Dr. Godard discussed Dr. Veith's report with Plaintiff and "let her know that I don't think she has been malingering." *Id.*

In a progress note dated August 4, 2005, Dr. Godard wrote that Plaintiff was still taking Zoloft and Xanax and was able to go outside on her porch for short periods. Tr. 244. She previously had not been able to go out. *Id.* On August 16, 2005, Dr. Godard noted that Plaintiff could stay out on her front porch "a little bit." Tr. 242. Dr. Godard met with Plaintiff at her home on August 23, 2005. Tr. 240. Plaintiff reported that she had had contact with her daughter for the first time in a year and a half, but soon after her daughter's phone call, she became quite depressed. *Id.* Dr. Godard wrote that Plaintiff had a new screen door on her house that had allowed her to keep the door open. She had not gone out much, however. *Id.*

On October 18, 2005, Plaintiff told Dr. Godard the Zoloft was not working and that she believed she was more irritable because of it. Tr. 238. Dr. Godard wrote that Plaintiff had a "very hard time going through the movements of gradual desensitization." *Id.* Although Plaintiff's efforts at getting outside the house had "often been quite significant," [w]hen she fails to feel comfortable in these experiences, she starts over again with her feelings of anxiety." *Id.* Dr. Godard wrote that Plaintiff "remains very incapacitated as far as being able to manage her life right now. She has not made a great deal of progress since I first began to see her. . . . [a]lthough she was for a while willing to work a little more on some of her issues of isolation." *Id.* Dr. Godard decided to discontinue the Zoloft. *Id.*

On November 4, 2005, Dr. Godard and Ms. Brown met Plaintiff at her home. Tr. 236. Plaintiff said she felt a "little bit better" without the Zoloft. *Id.* Dr. Godard wrote that Plaintiff

had been angry with her because "she feels that I have not understood her well and think that she is not trying on her treatment. I have encouraged that a schedule be created in a very concrete manner to look at her progress regarding her agoraphobia and anxiety." *Id.*  In a progress note dated December 30, 2005, Dr. Godard wrote that she and Ms. Brown had discussed cognitive therapy using a workbook on anxiety disorders for Plaintiff. Tr. 234. On April 28, 2006, Dr. Godard wrote that Plaintiff had called to talk about applying for disability and wanted to know whether Dr. Godard thought she was capable of working. Tr. 232. Dr. Godard responded that she thought Plaintiff was currently unable to work and that "I could not foresee a time in the future that she would be able to work." *Id.* On November 2, 2006, Dr. Godard wrote that Plaintiff said she had been raped a month earlier by "her previous friend," and since that time had had anxiety, PTSD symptoms with flashbacks, less sleep, depression, and lack of appetite. Tr. 230. Plaintiff requested Ativan (lorazepam). *Id.*

On December 30, 2005, Dr. Godard and Ms. Brown met with Plaintiff in her home. Tr. 229. Plaintiff agreed to begin a workbook. *Id.* Ms. Brown wrote that after Dr. Godard left, Plaintiff was angry because neither Dr. Godard nor Ms. Brown had "followed through" with getting her hypnosis for her agoraphobia. *Id.* On January 13, 2006, Ms. Brown gave Plaintiff a workbook and asked her to keep a journal about her reading and to do exercises to identify her feelings. Tr. 228. On February 27, 2006, Ms. Brown wrote that Plaintiff appeared "quite resistant" to the desensitization exercises and said the workbook had "done little good and in fact has angered her." Tr. 227. Ms. Brown wrote, "She chooses not to do the exercises that are recommended and supported by this writer and Dr. Godard." *Id.* On March 31, 2006, Ms. Brown asked Plaintiff about her log for identifying and documenting her efforts at desensitization and

Plaintiff became angry and argumentative. Tr. 226.

On May 1, 2006, Ms. Brown offered to give Plaintiff an additional session each month if she came to the office. Tr. 225. Ms. Brown wrote, "This is a therapeutic intervention in the effort to desensitize her by mere exposure." *Id.* Plaintiff agreed to allow Ms. Brown to pick her up and drive her to the grocery store in two days. *Id.* When Ms. Brown arrived to begin the "mere exposure" therapy, Plaintiff was nervous but willing to try. Ms. Brown drove her to three errands while Plaintiff remained in the car. Ms. Brown wrote, "It was obvious she was anxious as she would shake her hands, and blow on them to dry them." *Id.* Plaintiff reported feeling as though she would be physically ill. *Id.* On May 16, 2006, Ms. Brown wrote that Plaintiff had said she would not attend her son's graduation on June 9, 2006. Tr. 223. She had tried a trial run to see if two Ativan would allow her to manage, but the Ativan affected her vision. She felt that the Xanax had lost some of its efficacy as well. *Id.* On August 24, 2006, Dr. Godard and Ms. Brown completed a comprehensive evaluation of Plaintiff. Tr. 254. They wrote that Plaintiff continued to have agoraphobia and panic attacks, with her symptoms having remained the same or worsened somewhat over the past year. *Id.*

On October 13, 2006, Ms. Brown met with Plaintiff at home, writing that Plaintiff had not made an appointment with Dr. Godard to discuss anxiety medication and was "choosing not to do so as she feels she will not be able to endure the visit." Tr. 222. Plaintiff was angry about Dr. Godard and Ms. Brown's clinical decision to offer her one home visit per month and weekly clinical visits if she would come to the office. *Id.* Ms. Brown wrote, "It is very clear that office visits would be difficult for her but not totally impossible. This is still part of her treatment plan." *Id.* After a home visit on October 27, 2006, Ms. Brown wrote that Plaintiff reported

"having had an unconsensual sexual experience" someone named Sal, which she had reported to the police. Tr. 221. Plaintiff did not feel that she could come to the clinic for an appointment with Dr. Godard. *Id.*

On November 2, 2006, Ms. Brown wrote that Plaintiff had a telephone appointment with Dr. Godard and was getting some Ativan because she could not tolerate the taste of Xanax. Tr. 220. Plaintiff reported contacting "her friend Bob" to tell him not to return to her home and wanting to cut off all contact with males as she was "very hurt and angry with Sal." *Id.* She did not feel she could leave her home, but also felt she was not safe there. *Id.*

On November 30, 2006, Plaintiff told Ms. Brown she wanted her daughter choose who would be with her during delivery of her child, as Plaintiff refused to be there with other family members. Tr. 219. Plaintiff's daughter said she wanted her mother, but Plaintiff was "unsure she will be able to follow through." *Id.* Her daughter was due to deliver May 11, 2007. *Id.*

On April 12, 2007, Dr. Godard and Ms. Brown wrote a letter on Plaintiff's behalf stating that Plaintiff was "too fearful to leave the immediate environment of her home," and was unable to do her own shopping, afraid to shower due to her fear that someone would enter her home and assault her, and had "medical problems that have gone untreated due to severe anxiety of someone touching her." Tr. 260. They wrote that Plaintiff had "much family conflict and does not develop new relationships;" that she was "socially isolated," with "marked restrictions in social and familial functioning; and that she had "significant problems with concentration" and was forgetful. Tr. 261. They noted that her work history had been very limited and that she had been unsuccessful in functioning at a level that would permit gainful employment. She had very low stress tolerance and perspired profusely even during short in-home sessions with Dr. Godard

Opinion and Order, Page 12

and Ms. Brown. *Id.* They wrote that Plaintiff had described working at a mail express business

and being unable to keep the job because she was unable to concentrate. *Id.*

On April 16, 2007, Dr. Eriksen wrote a letter on Plaintiff's behalf stating that Plaintiff

suffered from panic disorder with severe agoraphobia, major depressive disorder, and PTSD.

Tr. 262. Dr. Eriksen wrote that Plaintiff had also been diagnosed with generalized anxiety

disorder. *Id.* "She suffers from such severe anxiety and panic that she at times has difficulty

coming in to the clinic to be seen," and "had home visits by the psychiatrist because of inability

to make it in to the mental health facility for treatment." *Id.* Dr. Eriksen doubted that Plaintiff

would be able to attend the Social Security hearing. *Id.*

**B.    Hearing Testimony**

Plaintiff testified by telephone. The ALJ told Plaintiff's attorney

> I know you asked that the claimant be allowed to testify by phone, and what I
> asked that they express to you was that I strongly preferred that she be here in
> person. There is a huge credibility issue in this case, so her presence would make
> a substantial difference, and apparently she's not interested in being cooperative
> on that point, so you want the hearing held by phone. Is that it?

Tr. 281. When Plaintiff came on the phone, the ALJ told Plaintiff,

> I tried to explain to your attorney that in this case your presence is almost crucial
> to the case because credibility is a major issue in the case, so the fact that you're
> not willing to be here is a negative from my point of view in terms of your being
> able to prevail in the case. Do you understand that?

Tr. 283. Plaintiff responded that it was "not a matter of choice." *Id.*

Plaintiff testified that she was unable to work because she had panic attacks and was

unable to leave her house. Tr. 295. She said her first panic attack was in 1993, *id.,* when she was

also diagnosed with agoraphobia. Tr. 296. She said "things just went downhill" when she was in

community college, after she caught a teacher stealing and the same teacher poisoned her with

Opinion and Order, Page 13

barium carbonate. *Id.* She said she was unable to attend her own graduation, or those of her son and daughter, and that she had been unable to see her first grandchild, born a week before the hearing. Tr. 297. She was not currently taking medication, because none of the medication she tried had worked for her. Tr. 297-98. She last saw Dr. Godard at her home in the summer of 2006. Tr. 298. Plaintiff testified that she had not seen Dr. Godard since then because "there was no reason to," adding "it doesn't work." *Id.* Plaintiff testified that both Dr. Godard and Ms. Brown had told her they were unable to help her. Tr. 299.

Plaintiff testified that she had not been to a grocery store in over two years. Tr. 304. She was able to dress and groom herself, tr. 306, perform household chores, and cook. Tr. 307. She had panic attacks "almost on a daily basis." *Id.* She did not attend church or club meetings, *id.*, and saw friends at her house. Tr. 309. She gave a baby shower for her daughter in March 2007 at her house with about 20 guests. Tr. 309. She did some craft activities at home. *Id.* She had a computer and used the internet. Tr. 310. She had not driven a car for the past two years. Tr. 311. She did not go to movies or restaurants. *Id.*

The ALJ called vocational expert ("VE") Patricia Ayerza. Tr. 313. The ALJ asked the VE to consider whether an individual of Plaintiff's age, education, and past relevant work experience, able to do simple tasks involving occasional social interaction, would be able to do any of Plaintiff's past relevant work. Tr. 318. The VE responded that the individual could return to the work Plaintiff described as shipping clerk, performed at an art gallery between 1992 and 1996, and characterized by the VE as a packager position. Tr. 316, 317, 319. The VE opined that there were other jobs Plaintiff could do within the ALJ's hypothetical, including small products assembly, cannery worker, and agricultural produce sorter. Tr. 320.

C.    **Third-Party Evidence**

Dorothy Brown, Plaintiff's mother, reported in a third-party statement dated October 30, 2004, that Plaintiff was able to clean house, cook, care for the family pets, and help her son with his homework. Tr. 74. Ms. Brown also reported that Plaintiff was no longer able to go places by herself or visit family and friends at their houses. *Id.* According to Ms. Brown, Plaintiff went outside about two times a week, but was able to shop for food. Tr. 76, 77. Ms. Brown wrote that Plaintiff did not handle stress or changes in routine well, and that she "really just wants to stay home all the time." Tr. 79.

In a letter dated April 16, 2007, Ms. Brown wrote that Plaintiff had panic attacks "all the time & never comes out of the house, when she does, she starts to turn so red & sweat really bad, than [sic] it's time to get her out of wherever she is at." Tr. 130. Ms. Brown stated that Plaintiff "hardly even talks to anyone as she says there is nothing to talk about." *Id.*

Susie Koziol, a friend, wrote a letter on Plaintiff's behalf dated April 13, 2007. Tr. 129. Ms. Koziol wrote that she had observed Plaintiff succumbing to severe panic attacks. *Id.* Ms. Koziol stated that she helped Plaintiff with grocery shopping, dropping off payments for bills, "basically anything that requires her to be outside of her home." *Id.* "Laura even struggles to take out the trash, and for the most part has to rely on visits from her few trusted friends and family to do it when they stop by." *Id.*

Beth Stevenson, a housing specialist for the Housing Authority of Yamhill County, wrote that she had known Plaintiff for five years as her case manager. Tr. 131. Ms. Stevenson wrote that after Plaintiff completed college in June 2004, "I have never seen anyone change so much so quickly." *Id.* Ms. Stevenson wrote that Plaintiff was "so outgoing when I first met her. Now she

is afraid to go out of her house, so I have to go to her home for our biannual meetings to update

her goals." *Id.* Ms. Stevenson wrote, "It is sad to see how much Laura has changed and I truly

hope that someday soon she will be able to leave the safety of her home." *Id.*

**D.    The Sequential Evaluation**

The Commissioner has established a five-step sequential process for determining whether

a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920. At step one, the Commissioner determines whether the claimant is engaging in any

substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner

proceeds to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do
> basic work activities, we will find that you do not have a severe
> impairment and are, therefore, not disabled. We will not consider
> your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step,

where the Commissioner determines whether the impairment meets or equals "one of a number

of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or

equals one or more of the listed impairments, the claimant is considered disabled without

consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment,

the Commissioner considers, at step four, whether the claimant can still perform "past relevant

work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age, education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

E.      **The ALJ's Decision**

The ALJ found, at step two, that Plaintiff's anxiety disorder and depressive disorder were severe impairments. Tr. 23. At step three, the ALJ concluded that these impairments, singly or in combination, did not meet or medically equal any of the listed impairments. *Id.*

The ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  The ALJ found "little evidence of significant difficulties with anxiety or other symptoms" at the time of the alleged onset date of June 2001. Tr. 25. The ALJ noted that when seen by her treating physician in February 2002 she reported panic attacks every one to two months, and using Xanax once a month. *Id.* The ALJ found that in January 2004, although Plaintiff reported significant family and financial stressors, her last prescription for Xanax had been in March 2003, when she received 20 tablets. Plaintiff refused any medications other than Xanax. In February 2004, Plaintiff was encouraged to try Zoloft but refused and did not begin taking Lexapro until May 2004. The ALJ discounted Plaintiff's testimony about agoraphobia because she had been able to complete her associate degree in June 2004 while working part-time. Tr. 25. The ALJ also found that Plaintiff had been resistant to medications and Dr. Godard's desensitization program and had refused to do workbook exercises recommended by Dr. Godard and Ms. Brown or come to the office. Tr. 26.

The ALJ gave great weight to the psychological evaluation performed by Dr. Veith in October 2004 that had resulted in a diagnosis of malingering. Dr. Veith had noted inconsistencies of performance that raised concerns about effort, scores on the MMPI 2 that were indicative of symptom magnification and test invalidity, and Plaintiff's dramatic and histrionic presentation. Dr. Veith had also noted Plaintiff's report that she was able to cook, clean, drive and shop, and his own observation that attention and concentration were normal and thought processes were organized. Tr. 25.

The ALJ rejected the third-party reports of Dorothy Brown, Susie Koziol, and Beth Stevenson, on the ground that they were not "entirely credible in light of the evidence of claimant's daily activities," including going to college, maintaining a work-study job, doing crafts, giving a baby shower, and doing some shopping. Tr. 26. In addition, the ALJ noted that Ms. Stevenson had reported significant community activities "until at least 2003." *Id.*

The ALJ gave little weight to the opinions of Dr. Godard and Ms. Brown, concluding for both that they were unaware of or had ignored the facts, and had been given misinformation by Plaintiff. Tr. 26, 27. The ALJ noted that Dr. Godard had written that Plaintiff left a job at Mail Express because of stress when Plaintiff testified that she left the job because she took another, and that Dr. Godard had indicated a limited work history for Plaintiff when her earnings record reflected 10 years of steady employment. Tr. 26. The ALJ found that Dr. Godard and Ms. Brown had "apparently relied on the claimant's self-report in reaching their opinion that she is unable to work." Because the ALJ had found Plaintiff not credible, she rejected the opinions of Dr. Godard and Ms. Brown because they had relied on Plaintiff's own reports. Tr. 27.

The ALJ rejected Dr. Eriksen's opinion that Plaintiff was unable to pursue activities

outside her home on the grounds that Dr. Eriksen was not a psychiatrist and her opinion was not consistent with the evidence that Plaintiff had attended community college, worked part-time, and obtained a degree between 2003 and 2004. Tr. 27. In addition, the ALJ noted, Plaintiff received medical treatment when needed, including treatment for back pain and gallbladder surgery.[10] *Id.* The ALJ concluded that the opinions of Dr. Eriksen, like those of Dr. Godard and Ms. Brown, were entitled to little weight because they were based on Plaintiff's self-reports.

The ALJ relied on the opinion of reviewing psychologist Dr. Rethinger that Plaintiff was capable of simple work, precluded from work with the public, but able to get along with workers and supervisors. Tr. 27. The ALJ found Dr. Rethinger's opinion "generally consistent with the treatment records and evidence of claimant's daily activities." Tr. 27. Accordingly, at step four, the ALJ found Plaintiff was capable of performing past relevant work as a packager. *Id.*

### III.  STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if  "the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

---

[10] The record indicates that Plaintiff agreed to gallstone surgery on October 28, 2005, tr. 267, but did not keep her appointment for a post-operative visit. Tr. 266.

Opinion and Order, Page 19

The initial burden of proving disability rests on the claimant. *Meanel*, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV. DISCUSSION

Plaintiff asserts that the ALJ erred by: (1) rejecting the testimony of the lay witnesses without providing reasons germane to each witness; (2) rejecting the 2007 opinions of treating physicians Eriksen and Godard, and those of Ms. Brown, in favor of the 2004 opinions of nonexamining physicians; (3) ignoring limitations identified by Doctors Eriksen and Godard and Ms. Brown in determining Plaintiff's RFC; (4) failing to consider Plaintiff's panic attacks and agoraphobia in determining her RFC; and (5) assigning significant weight to Dr. Rethinger's 2004 opinion that Plaintiff could frequently interact with coworkers and supervisors.

The court concludes that these asserted errors arise primarily from the fact that the ALJ's June 2007 decision, rejecting the opinions of Dr. Eriksen and Dr. Godard, rejecting the third-party statements, finding Plaintiff not credible, and relying on Dr. Rethinger for the RFC finding, relies upon evidence that existed before January 2005. Nearly all of the ALJ's factual findings rest on: (1) the evidence that Plaintiff attended community college and worked part-time in 2003 and 2004; (2) Dr. Veith's psychological evaluation of October 2004 concluding that Plaintiff was

Opinion and Order, Page 20

malingering; and (3) Dr. Rethinger's assessment of December 2004. The ALJ rejected or disregarded all the evidence after December 2004, including the 2007 opinions of Doctors Eriksen and Godard with respect to Plaintiff's agoraphobia and panic attacks, the progress notes from Dr. Godard and Ms. Brown for 2006 and 2007, and the third-party reports submitted in 2007.

The court concludes that the ALJ's findings with respect to disability are free of legal error and supported by substantial evidence only through December 2004. The ALJ's findings with respect to disability after December 2004 are neither legally correct nor supported by substantial evidence in the record. The absence of evidentiary support for the ALJ's findings on disability after December 2004 is particularly striking with respect to the opinions of Doctors Godard and Eriksen.

There are three sources of medical opinions in Social Security cases: treating, examining, and non-treating, non-examining ("reviewing") physicians. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001); *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than that of an examining physician, and an examining physician's opinion carries more weight than that of a reviewing physician. *Holohan,* 246 F.3d at 1202;  20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists.  *Holohan,* 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(5). In general, the most recent medical report is the most probative, *see Young v. Heckler,* 803 F.2d 963, 968 (9th Cir. 1986), and a treating physician's most recent medical reports are highly probative.  *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001).

Under these standards, the 2004 opinions of reviewing psychologist Dr. Rethinger and examining psychologist Dr. Veith were entitled to significantly less weight than the 2007 opinions of treating psychiatrist Dr. Godard and treating primary care physician Dr. Eriksen. Although Dr. Rethinger and Dr. Reith are psychologists, their specialties do not, as the ALJ erroneously found, entitle their opinions to greater weight than that of general practitioner Dr. Eriksen, because a medical doctor is also qualified to give psychiatric opinions. *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987) (duly licensed primary care physician can practice and render psychiatric services and give a qualified opinion on how claimant's mental state impacts physical disability); *Lester,* 81 F.3d at 833 (ALJ cannot disregard treating physician's opinion on claimant's mental functioning solely because treating physician not a mental health expert; treating physician's opinion constituted competent psychiatric evidence, notwithstanding the fact that physician was not a board-certified psychiatrist).

As a general rule, the opinions of treating physicians, even when contradicted by other evidence, may be rejected only if the ALJ provides  "specific and legitimate" reasons supported by substantial evidence in the record.  *Holohan,* 246 F.3d at 1202; *Lester*, 81 F.3d at 830.  The treating physician's opinion is still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527.  *Holohan,* 246 F.3d at 1202.  *See also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("Adjudicators must remember that a finding that a treating source medical opinion is . . . inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.");

Opinion and Order, Page 22

*Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (If treating physician's opinion is not given controlling weight because it is not "well supported" or because it is inconsistent with other substantial evidence in the record, ALJ is to consider specified factors in determining the weight it will be given, including the length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship.)

The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies rejection of the opinion of either an examining physician or a treating physician. *Lester*, 81 F.3d at 831-32. Thus, the opinion of a non-examining medical expert, with nothing more, is not substantial evidence sufficient to support a finding where the record contains conflicting observations, opinions and conclusions of an examining physician. *Stark v. Shalala*, 886 F. Supp. 733, 735 (D. Or. 1995); *Erickson v. Shalala*, 9 F.3d 813 (9th Cir. 1993).

The ALJ found Dr. Rethinger's opinions "generally consistent with the treatment records," but this statement is inaccurate. Dr. Rethinger's opinions are not consistent with any of the treatment records except possibly the opinion of Dr. Veith, and the opinions of Doctors Rethinger and Veith are contradicted by the later opinions of treating practitioners Dr. Eriksen and Dr. Godard. Dr. Rethinger's opinion does not constitute substantial evidence to support the ALJ's RFC finding.

Similarly, examining psychologist Dr. Veith's 2004 opinions do not constitute evidence with sufficient weight to justify the ALJ's rejection of the more comprehensive, later opinions of treating physicians Godard and Eriksen. Dr. Veith's opinion that Plaintiff was a malingerer was directly contradicted by the opinion of treating psychiatrist Dr. Godard that she was not. The ALJ gave only two reasons for rejecting the opinions of Doctors Eriksen and Godard: (1) minor

historical inconsistencies in Plaintiff's employment record, which the court finds neither specific to the question of disability nor based on substantial evidence in the record; and (2) reliance on what the ALJ characterized as Plaintiff's subjective complaints, which the ALJ had already discounted. The ALJ's latter finding is erroneous. The opinions of Doctors Eriksen and Godard are amply supported by their clinical observations of Plaintiff over a period of over two years[11], as well as Plaintiff's own reports of symptoms. "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r,* 528 F.3d 1194, 1199 (9th Cir. 2008), *citing Edlund v. Massanari,* 253 F.3d 1152, 1159 (9th Cir. 2001).

The ALJ improperly relied on evidence from 2003 and 2004 as her basis for rejecting the third-party reports, all of which are dated 2007. Lay testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account, *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993), unless he or she expressly decides to disregard such testimony, in which case "he must give reasons that are germane to each witness." *Id. See also Lewis v. Apfel,*

---

[11] *See, e.g.,* tr. 252 (Dr. Godard's observation at first visit that Plaintiff "very, very anxious. Her palms are cold and sweaty. . . [s]he is not able to sit down"); tr. 246 (Dr. Godard's observation that Plaintiff was irritable, anxious, depressed, and angry); tr. 226 (Ms. Brown's observation that Plaintiff was angry and argumentative); tr. 225 (Ms. Brown's observation that Plaintiff was nervous and obviously anxious "as she would shake her hands, and blow on them to dry them"); tr. 254 (observation of both Dr. Godard and Ms. Brown that Plaintiff was irritable and defensive); tr. 236 (Dr. Godard's observation that Plaintiff's speech was "often dramatic and sometimes loud but of normal rate and rhythm," "[l]atencies are normal," thoughts "generally goal directed although sometimes . . . a little circumferential," mood "a little angry and also anxious," and affect "more irritable today."); tr. 240 (Dr. Godard's observation that Plaintiff's mood "currently depressed" and "she does get tearful"); tr. 242 (Dr. Godard's note that Plaintiff showed a "great deal of anxiety").

Opinion and Order, Page 24

236 F.3d 503, 511 (9th Cir. 2001) and *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). The ALJ's stated reason for rejecting all three reports was their inconsistency with Plaintiff's daily activities, but these activities were going to college and maintaining a work-study job in 2003-2004 and community activities "until at least 2003." The court concludes that the ALJ's rejection of the third-party reports is not based on reasons germane to each witness and is not supported by substantial evidence in the record.

In *Lester*, 81 F.3d at 834, the court held that where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, the court credits that opinion as a matter of law. *See also Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) and *Moisa v. Barnhart,* 367 F.3d 882 (9th Cir. 2004) (court takes the relevant testimony to be established as true and remands for an award of benefits). In *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that evidence should be credited and an immediate award of benefits directed when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting the opinion of a treating or examining physician, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

The court concludes that the ALJ's improper rejection of the opinions of Doctors Eriksen and Godard requires that they be credited. Crediting the opinions of Doctors Eriksen and Godard necessarily invalidates the ALJ's sequential analysis findings beginning with step two. Because the ALJ failed to provide legally sufficient reasons for rejecting the opinions of the third-party witnesses, their testimony must also be credited as true. It, therefore, follows that Plaintiff must be found disabled. On this record, however, an issue remains with respect to the onset of

Plaintiff's disability. As noted, the ALJ's finding of non-disability between the alleged onset date, June 2001, and the end of 2004, is free of legal error and based on substantial evidence in the record, while the ALJ's finding of non-disability after 2004 is erroneous and unsupported by substantial evidence. Accordingly, this case is remanded for further administrative proceedings to determine the onset of Plaintiff's disability.

### V.  CONCLUSION

The Commissioner's decision is affirmed with respect to the period between the alleged onset date, June 2001, and December 2004. The Commissioner's decision is reversed and remanded for further proceedings to determine the onset date of Plaintiff's disability, at which the opinions of Doctors Eriksen and Godard, and the testimony of the third-party witnesses, are to be credited as true.

IT IS SO ORDERED.

DATED this 16th day of March, 2012.

/s/ Michael H. Simon

Michael H. Simon
United States District Judge